UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALVIN LESTER KEY,

           Petitioner,

                               CASE NO. 11-14850

v.

                               PAUL D. BORMAN

LLOYD RAPELJE,                   UNITED STATES DISTRICT JUDGE

           Respondent.

_____/

## OPINION AND ORDER
## DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
## BUT GRANTING IN PART A CERTIFICATE OF APPEALABILITY

Petitioner Alvin Lester Key has filed a habeas corpus petition challenging his state conviction for two counts of first-degree criminal sexual conduct involving his young daughter. He is serving a sentence of fifteen to forty years in prison. He argues through counsel that prejudicial evidence of prior "bad acts" was improperly admitted at his trial, that the prosecutor engaged in outcome-determinative misconduct, that appellate counsel was ineffective, and that he was denied his right to a jury drawn from a fair cross-section of the community. Having reviewed the pleadings and record, the Court finds that Petitioner's claim about the jury venire is procedurally defaulted and that his other claims lack merit. Accordingly, the habeas petition will be denied.

## I. BACKGROUND

Petitioner was charged in an amended information with inserting his penis and finger in his daughter's vagina when the girl was twelve to fifteen years old.  The Court will refer to the girl as "the complainant."

Petitioner was tried in Kent County Circuit Court in Grand Rapids, Michigan where the evidence established that Petitioner fathered six children with three different women.  The complainant was Petitioner's child through Cheniqua Pinder.  Petitioner and Cheniqua never married although they also had two other children, JaMichael and Brandon.

There was a substantial amount of evidence at trial suggesting that Petitioner engaged in sexual activity with two other young girls, whom the Court will refer to as A.K. and Y.K.   A.K. and her sister Tanisha were Petitioner's daughters through Gloria Kidd.  Y.K. was Gloria's daughter through another man.

Petitioner was married to Lisa Key at the time of his trial.  Petitioner and Lisa had a child named Jasmine.  Lisa also had a son named Jordan who was not Petitioner's child.

The prosecutor's theory was that Petitioner sexually abused the complainant, A.K., and Y.K., and that Petitioner and the women who gave birth to his children maintained a conspiracy of silence to prevent the abuse from becoming known and because Petitioner provided financial support to the women.  Petitioner maintained that he was not guilty and that there was no conspiracy of silence.  The trial lasted sixteen days.  A partial summary of the evidence follows to provide a context for Petitioner's claims.

## A.  The Prosecution Witnesses

### <u>The Complainant</u>

The complainant was seventeen years old at the time of Petitioner's trial.  She testified that, for most of her life, she lived with Petitioner.  One night when she was in the seventh or eighth grade, Petitioner came into her bedroom, got in her bed, and put his penis in her vagina.  That was the only time Petitioner penetrated her with his penis, but on other occasions, he would touch her breasts and buttocks.  Sometimes, he inserted his finger in her vagina.  She was fourteen or fifteen years old when that happened.

According to the complainant, there was a rule in the house that "what goes on in the house stays in the house."  In other words, they were not supposed to talk about what happened at home.  Consequently, she was afraid to tell anyone about what happened with Petitioner.  She did not think her stepmother would believe her, and when she eventually disclosed the abuse to her stepmother and grandmother, they told her that they would handle the matter and that she should not get anybody else involved.

In June of 2005, she went to live with her biological mother, Cheniqua Pinder.  A few weeks later, she informed Cheniqua of the sexual abuse and the two of them reported the matter to the police.  After Petitioner's arrest, she called her stepmother and informed her about Petitioner's arrest.  She explained to her stepmother that the reason she reported the matter to the police was because her stepmother did not do anything about the abuse and because she (the complainant) was worried about her sister Jasmine.  The police subsequently arranged for her to meet A.K. at the police station.  A.K. pointed out to her

3

that Petitioner provided for the family and that the children would not have food, money, clothes, or medicine if she disclosed what Petitioner had done.  At trial, the complainant denied being influenced by her mother to report the crime.

**JaMichael Key**

JaMichael Key was eighteen years old at Petitioner's trial.  He testified that Petitioner and Cheniqua Pinder were his parents and that the complainant was his sister. He claimed that when he and the complainant were younger, Petitioner would sometimes tell him and his brother to go outside while Petitioner and the complainant or A.K. stayed inside the house with him.  One time, Petitioner told the two boys to do some yard work, but the complainant asked him to stay inside.  So, he and his brother armed themselves with a knife and a bat and then listened outside Petitioner's bedroom as Petitioner told the complainant to turn around.  They were prepared to enter the room if they heard something suspicious, but Petitioner allowed the complainant to leave when she refused to do the things he asked of her.

JaMichael claimed that, although he did not actually observe Petitioner sexually abuse anyone, he did observe Petitioner go in his sisters' bedroom at times, and he knew what was going on in the household.  He did not say anything about it because his sisters refused to disclose the abuse, and he feared that his parents would beat him or that people would accuse him of lying if he said anything.  Additionally, A.K. told him that Petitioner would go to jail and that they would be placed in foster care if JaMichael disclosed anything.  He finally said something about the abuse in 2005 after the complainant spoke

4

up and told the truth.

**Lanita and Harry Weir**

Lanita Weir testified that Petitioner's wife, Lisa Key, was her daughter.  Mrs. Weir claimed that, one time when the complainant and her brother JaMichael were visiting her, she heard JaMichael say to the complainant, "That's why you are being molested."  Mrs. Weir then stepped into the room and asked the children who was being molested.  The children responded that the complainant was being molested by her father.  Mrs. Weir did not confront Petitioner with the children's disclosure for a number of reasons.  She feared that the children would get in trouble, that Petitioner and Lisa would prevent the children from visiting her, and that Lisa would not be helpful because Lisa had defended Petitioner on a prior occasion when Mrs. Weir mentioned some things to her about Petitioner.

Harry Weir testified that, in 2003, his wife Lanita informed him that the complainant had said she was being molested.  In response, Mr. Weir called Children's Protective Services.

**Cheniqua Pinder**

The complainant's biological mother, Cheniqua Pinder, claimed that, in October of 2002, Petitioner co-signed for her apartment, but that he did not have a key to it.  About three weeks after she moved into the place, she came home from work and saw Petitioner's car in her driveway.  At first she could not get inside the place because the screen door was locked from the inside.  She eventually managed to unlock the door and go inside.  She saw Petitioner and A.K., who was Petitioner's daughter with Gloria Kidd.

5

Petitioner was in her bedroom.  The bed sheets had wet stains on them, and the room smelled like sex.  She reported the incident to the police and brought the sheets and a towel to the police station.  She did not stay in her apartment that night, and when she returned on the following Sunday, her personal belongings were missing.  Gloria Kidd subsequently moved into the place.

### Lisa Key

Petitioner's wife Lisa Key testified that she married Petitioner in 1995 and that Petitioner got custody of the complainant and JaMichael in 1997.   Mrs. Key testified that she was very close to the complainant and that the complainant never informed her that Petitioner sexually abused her.  She also claimed that she never witnessed Petitioner physically abuse any children.

### Bethany Thompson

Dr. Bethany Thompson testified that she performed a gynecological examination on the complainant on August 5, 2005.  During the examination, the complainant revealed that she had recently informed her mother that she was a victim of sexual abuse three or four years earlier.  The gynecological examination was normal and consistent with what the complainant had said.

### Matthew Kuzma

Matthew Kuzma was employed with the state agency known as Children's Protective Services.  He testified that the complainant's biological mother made only one complaint to Children's Protective Services and that the complaint pertained to A.K., not

6

the complainant.  Mr. Kuzma also testified that, in May of 2001, he first became aware of Y.K.'s allegation.  Y.K. later recanted her allegation and then once again claimed that something had occurred.  Y.K. and Gloria Kidd's other children were removed from the home because Children's Protective Services believed Gloria was not being supportive. In Mr. Kuzma's opinion, a recorded statement and a written statement that Y.K. made were inconsistent with Y.K.'s original allegation.  Y.K.'s testimony at a preliminary examination in state district court on August 3, 2001 also was inconsistent with Y.K.'s allegation, but Children's Protective Services thought that Y.K. had been abused.

**Gloria Kidd**

Gloria Kidd testified that she and Petitioner were the parents of A.K. and Tanisha Key.  Y.K. was her daughter also, but Petitioner was not Y.K.'s father.  According to Ms. Kidd, Y.K. made allegations about Petitioner in 2001, but Y.K. later recanted her allegation in a written statement and on tape, and the case was dismissed on August 3, 2001.  A.K. also made allegations against Petitioner, but Ms. Kidd claimed at trial that those allegations were untrue and that nothing came of them.

**A.K.**

A.K. testified that, when she was eight or nine years old, she went to live with Petitioner, her stepmother Lisa, the complainant, JaMichael, and her brother Jordan.  On or about October 25, 2002, she went to Cheniqua's apartment with her father.  While they were there, she watched television. She went into the bedroom because her father was in the bathroom, and she had to check on a vaginal problem that she was having.  After her

7

father exited the bathroom, she used the bathroom to clean up.  As she walked out of the bathroom, Cheniqua came home.  Later that year, she went to the police department pursuant to an investigative subpoena and testified under oath that she did not have sexual intercourse with Petitioner.

Continuing, A.K. explained that Children's Protective Services took her out of her home and that she later told her foster mother that her father was sexually abusing her. She later learned that her sister Y.K. had made the same allegation.  A.K. nevertheless claimed at trial that Petitioner had never sexually abused her and that she previously lied about the sexual abuse because a relative of hers had said she could go home sooner if she said she was sexually abused.  She denied having sex with her father in Cheniqua's apartment in 2002, and she denied lying to the jury to protect anyone or to receive a reward for her testimony.  She explained that, if her vaginal secretions were found on the bed sheets at Cheniqua's apartment, it was due to the vaginal problem she was having at the time and the fact that she sat on the bed to examine herself while her father was in the bathroom.

A.K. admitted to telling the complainant that their father was abusing her also, but she claimed at trial that was a lie.  And even though she could not remember expressing concern about how their mothers would get by if the complainant went forward with her allegations, she admitted to the jury that she had said something about financial issues to the complainant.

8

**Joel Schultze**

Joel Schultze was a DNA analyst and supervisor for the Forensic Science Division of the Michigan State Police at the time of Petitioner's trial. He testified that DNA on the bed sheet taken from Cheniqua's apartment in 2002 matched A.K.'s DNA and that DNA on a towel taken from Cheniqua's apartment matched both A.K. and Petitioner. The four stains that he examined on the sheet tested negative for semen.

**Y.K.**

Y.K. testified that, although Petitioner was not her biological father, he was like a father to her. In 2001, however, she informed a friend that Petitioner was molesting her, and the matter was eventually reported to the authorities. She was removed from her home, but during a visit with her mother, she made a written statement and a recording in which she stated that there had been no abuse. And, at the preliminary examination on August 3, 2001, she testified that Petitioner never molested her.

Y.K. claimed at trial that she made the original allegation because she wanted to live with her grandmother. She denied being offered anything or pressured to change her story.

**Eugene Shatz**

The trial court qualified Dr. Eugene Shatz as an expert in the field of child sexual abuse and pediatrics. Dr. Shatz testified that, on June 28, 2001, he and his assistant saw Y.K. who stated that Petitioner had sexually abused her for a number of years and that he had impregnated her two times. Y.K. also stated during her medical appointment that she

had no sexual contact with anyone other than Petitioner and that her mother had asked her to deny the allegations because they would get Petitioner into a lot of trouble.

### Ron Gates

Sergeant Ron Gates of the Kent County Sheriff's Department testified that when he first interviewed Y.K., she talked about being abused by Petitioner. She later recanted her original statement to prevent Petitioner from getting into trouble. She was then re-interviewed and said that it really did happen and that she was telling the truth, but that her mother had told her to lie and say that it never happened. At the preliminary examination, Y.K. testified that nothing happened, and the criminal case against Petitioner was dismissed.

A.K.'s allegations came to the attention of the police department on September 10, 2001. No charges were brought in that case because A.K. did not disclose any abuse to the police.

## B. Defense Witnesses

Petitioner did not testify, but he produced several witnesses in his defense.

### Deanan DeVries

Ms. Devries was a caseworker for Children's Protective Services in 2003. She was assigned to investigate an allegation that Petitioner knocked his stepson Jordan's glasses off his face and put Jordan in a choke hold. On August 25, 2003, she spoke to each family member, but neither the complainant, nor Jordan, mentioned that Petitioner had sexually molested the complainant.

10

On September 2, 2003, the Weirs informed Children's Protective Services that Petitioner had been touching the complainant in a way that made her feel uncomfortable. Ms. DeVries' supervisor, however, did nothing with that information because he thought that the matter had already been investigated.

### Brandon Armstrong

Police Officer Brandon Armstrong testified that, on August 3, 2005, the complainant, Cheniqua Pinder, and JaMichael Key came to the police station and reported that Petitioner had sexually molested the complainant. The complainant indicated that she had been sexually assaulted about thirty times over a three-year period, but that she did not feel there were any serious injuries. The complainant claimed that Petitioner had threatened to beat her and her mother if she told anyone about the assaults and that she was disclosing the abuse so that her father would not do the same thing to his and Lisa Key's daughter Jasmine.

Cheniqua Pinder informed Officer Armstrong that she was afraid to make the report because Petitioner had a violent temper and might do something to hurt her or the children. JaMichael Key informed Officer Armstrong that he believed Petitioner was molesting his sisters.

### Deborah Reynolds

Deborah Reynolds was employed by Children's Protective Services in 2001, and in September of 2001, she investigated the safety of the children living with Petitioner. On September 18, 2001, Ms. Reynolds spoke with the complainant to assess whether she

11

was at risk of harm from Petitioner.  Neither the complainant, nor the other children in the household, reported any sexual abuse, and Ms. Reynolds ultimately concluded that the children were not at risk living with Petitioner and Lisa Key.

### Jeanette McDowell

Jeanette McDowell was a licensed school psychologist, who testified that she counseled the complainant approximately twenty-two times from 2001 to 2003.  During those sessions, the complainant never revealed that Petitioner or anyone else was sexually abusing her.  In fact, the complainant felt alienated from her stepmother and stated that she loved her father and was happier living with her father and stepmother than with her biological mother, Cheniqua Pinder.

### Brad Osburn

Brad Osburn testified that he was a friend of Petitioner and had known Petitioner for about four years.  Mr. Osburn also stated that he had been to Petitioner's home and that the family members appeared to get along with each other.  On cross-examination, the prosecutor asked Mr. Osburn whether he was aware that Petitioner was recently convicted of putting someone in a coma.  Mr. Osburn said that he was not aware of Petitioner's prior conviction and that he had found Petitioner to be mild-mannered and easygoing.

### Gina Young

Gina Young testified that she knew Petitioner and his wife and that she saw the complainant in the Key household between 2001 and 2004.  She found the complainant to

12

be a normal child who was happy with both of her parents. The complainant never mentioned to Ms. Young that Petitioner had sexually abused her, and Ms. Young never saw any inappropriate behavior between Petitioner and the complainant.

Ms. Young also testified that one day she was asked to go to the Key home where she found Lisa Key crying on the floor. She did not hear Lisa say anything about kicking Petitioner out of the house, and she did not ask Lisa why she was so upset. Nor did Lisa tell Ms. Young about the complainant's disclosure.

### Katrina Wimblay

Katrina Wimblay testified that she was a good friend of Lisa Key and that, during the summer of 2005, Lisa Key asked her to come over to her house because she was upset. After she arrived at the house, Lisa informed her that the complainant had said Petitioner made her feel uncomfortable. Lisa also said that Petitioner had left the home voluntarily. There was no discussion about Lisa kicking him out of the house. Ms. Wimblay claimed that she never observed any inappropriate behavior while she was at the Key household and that the complainant never confided in her that Petitioner was sexually abusing her.

## C. The Verdict, Sentence,  Direct Appeal, and State Collateral Proceedings

On October 27, 2006, the jury found Petitioner guilty, as charged, of two counts of criminal sexual conduct in the first degree. *See* Mich. Comp. Laws § 750.520b(1)(a) (sexual penetration of a person under thirteen years of age) and Mich. Comp. Laws § 750.520b(1)(b) (sexual penetration of a relative at least thirteen years of age, but less than

sixteen years of age). On January 11, 2007, the trial court sentenced Petitioner as a habitual offender, third offense, to two concurrent terms of fifteen to forty years in prison.

Petitioner moved for a new trial on grounds that the jury's verdict was against the great weight of the evidence and that the trial court erred by excluding evidence that in 1998 the complainant's mother falsely accused Petitioner of raping her. The trial court denied Petitioner's motion without explanation.

In an appeal of right, Petitioner argued that (1) the trial court erred in admitting evidence of his alleged sexual abuse of other children, (2) the trial court erroneously admitted his wife's out-of-court statements, and (3) the prosecutor committed misconduct by making inappropriate comments and closing arguments and by introducing inflammatory evidence. The Michigan Court of Appeals concluded that the "other acts" evidence was properly admitted, that the trial court erroneously admitted the out-of-court statement by Petitioner's wife, but that the error was not outcome-determinative, and that the prosecutor's conduct did not deprive Petitioner of a fair trial. The Court of Appeals affirmed Petitioner's conviction and sentence in an unpublished decision. *See People v. Key*, No. 277762, 2008 WL 3009937 (Mich. Ct. App. Aug. 5, 2008). Petitioner raised the same claims in an application for leave to appeal in the Michigan Supreme Court. On June 3, 2009, the state supreme court denied leave to appeal because it was not persuaded to review the issues. *See People v. Key,* 483 Mich. 1031 (2009) (table).[1]

_____

[1] Then-Chief Justice Marilyn Kelly and Justice Michael F. Cavanagh voted to grant leave to appeal.

14

On July 15, 2010, Petitioner filed a motion for relief from judgment through his present attorney.  His first claim alleged that the introduction of prior "bad acts" evidence deprived him of his constitutional rights to a fair trial, to present a defense, and to confront the witnesses against him.  His second claim alleged that the prosecutor engaged in misconduct by (a) using witnesses beyond the limited scope of their purpose, (b) making improper comments during the presentation of evidence, and (c) making improper comments during closing arguments.  His third claim alleged that counsel on direct appeal failed to raise critical issues and failed to raise other issues in a proper manner.  His fourth and final claim alleged that he was denied his right to be tried by an impartial jury drawn from a fair cross-section of the community.  The trial court denied the motion on grounds that Petitioner raised, or could have raised, his claims on direct appeal.  The Michigan Court of Appeals denied leave to appeal the trial court's decision for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Key*, No. 299958 (Mich. Ct. App. Nov. 18, 2010).  On September 26, 2011, the Michigan Supreme Court denied leave to appeal for the same reason.  *People v. Key*, 490 Mich. 872 (2011) (table).  On November 3, 2011, Petitioner filed his habeas corpus petition in this Court, raising the same claims that he presented to the state courts.

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, __,

15

131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, the Court may not grant a state prisoner's

application for the writ of habeas corpus unless the state court's adjudication of the

prisoner's claims on the merits

> (1)     resulted in a decision that was contrary to, or involved an
>          unreasonable application of, clearly established Federal law,
>          as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable
>          determination of the facts in light of the evidence presented in
>          the State court proceeding.

28 U.S.C. § 2254(d).   "[A] federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly.  Rather, that application

must also be unreasonable."  *Williams v. Taylor*, 529 U.S. 362, 411 (2000) (O'Connor, J.,

opinion of the Court for Part II).

     "AEDPA thus imposes a 'highly deferential standard for evaluating state-court

rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court

decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)

(*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "A state court's determination

that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*,

131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   To

obtain habeas corpus relief, "a state prisoner must show that the state court's ruling on the

claim being presented in federal court was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

A state court's determination of the facts is presumed to be correct unless the petitioner rebuts this presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). And a federal habeas court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1398 (2011).

## III.  ANALYSIS

### A.  "Bad Acts" Evidence and the Right to Defend and to Confront Witnesses

The first habeas claim alleges that Petitioner was denied his right to a fair trial through the improper admission of prior "bad acts" evidence. Petitioner also claims that, even if the evidence were admissible, he was denied his right to present a defense and to confront the witnesses against him because he was prohibited from rebutting areas that the prosecution was allowed to explore.

#### 1.  The Due Process Claim

Petitioner alleges that he was denied his right to due process by the admission of highly prejudicial evidence of prior "bad acts." The "bad acts" evidence consisted of testimony that Petitioner sexually abused Y.K. and A.K. before he committed the acts for which he was on trial. Petitioner claims that there was insufficient evidence that he committed the prior acts and that the probative value of the evidence was outweighed by its prejudicial effect. Petitioner also contends that the large amount of evidence about

Y.K. and A.K. forced him to defend against accusations by three alleged victims, even though there was only one complainant and even though both Y.K. and A.K. denied that he had abused him. The Michigan Court of Appeals adjudicated Petitioner's evidentiary claim on the merits and concluded that the evidence was properly admitted.

This Court finds no merit in Petitioner's claim because "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Consequently, "there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to' under AEDPA." *Id.* at 513. Petitioner's personal disagreement with the state court's ruling on "other acts" evidence "is not cognizable on federal habeas review, inasmuch as it involves no constitutional dimension." *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007).

Furthermore, although Michigan Rule of Evidence 404(b)(1) prohibits the admission of evidence of "other crimes, wrongs, or acts" to show that a person acted in conformity with other bad conduct, alleged violations of the Michigan Rules of Evidence "are not cognizable on federal habeas review." *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009). Federal habeas corpus relief simply "does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241 and *Rose v. Hodges*, 423 U.S. 19, 21 (1975) ( *per curiam*)). "Trial court errors in state

18

procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo,* 365 F.3d 487, 494 (6th Cir. 2004) (citing *Estelle v. McGuire*, 502 U.S. at 69-70).

It was not fundamentally unfair to admit evidence of Petitioner's purported abuse of Y.K. and A.K. because both girls denied being abused by Petitioner, and evidence to the contrary demonstrated that Petitioner had a system of sexually abusing adolescent girls who were related to him or his girlfriends.  This was proper under Michigan Rule of Evidence 404(b)(1), which states that evidence of other crimes, wrong, or acts may be admissible as proof of a "scheme, plan, or system in doing an act . . . ."  In addition, Mich. Comp. Laws § 768.27a(1) permits prosecutors in a case involving a charge of criminal sexual conduct against a minor to introduce evidence that the defendant committed another crime of criminal sexual conduct against a minor.

The trial court, moreover, instructed the jurors that, if they believed evidence that Petitioner engaged in improper sexual conduct for which he was not on trial, they must consider the evidence only for the limited purpose of judging the believability of testimony about the acts for which Petitioner was on trial.  The trial court charged the jurors not to consider the evidence for any other purpose and not to conclude that the evidence showed Petitioner was a bad person or likely to commit crimes.  The court also said that the jurors must not convict Petitioner because they thought he was guilty of

19

other bad conduct.  (Trial Tr. Vol. XV (Part 1), 97, Oct. 26, 2006).  For all the reasons given above, the Court concludes that Petitioner is not entitled to relief on the basis of his claim that the prosecutor was permitted to introduce prior "bad acts" evidence.

### 2.  The Right to Defend and to Confront Witnesses

Petitioner asserts that the prior "bad acts" evidence not only deprived him of due process, but also violated his constitutional rights to defend himself and to confront the witnesses against him.  He claims that he was repeatedly prohibited from rebutting the evidence and that the trial court cut him off when he attempted to defend against the uncharged crimes.

None of the state courts adjudicated this constitutional issue on the merits.  On direct appeal, the Michigan Court of Appeals addressed only Petitioner's Rule 404(b) claim, and, on state collateral review, the trial court ruled that Petitioner had raised his claim on direct appeal.  Because the state courts did not address Petitioner's constitutional claims on the merits, this Court's review of Petitioner's claim is *de novo*.  *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008).

### a.  Legal Framework

A defendant in a criminal prosecution is entitled to "a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485 (1984), but "[a] defendant's right to present relevant evidence is not unlimited. . . ."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  It is "subject to reasonable restrictions."  *Id*.  The Constitution "permits judges to exclude evidence that is repetitive . . . , only marginally

relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues."
*Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (quotation marks omitted).  "This
court's duty 'is not to determine whether the exclusion of the evidence by the trial judge
was correct or incorrect under state law, but rather whether such exclusion rendered
petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional
rights.' "  *Lewis v. Wilkinson*, 307 F.3d 413, 420 (6th Cir. 2002) (quoting *Logan v.
Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)).

 The Constitution also guarantees an accused the right "to be confronted with the
witnesses against him."  U.S. CONST. amend. VI.  This right includes the right of cross-
examination, *Pointer v. Texas*, 380 U.S. 400, 404 (1965), and more particularly, "a
defendant's right to cross-examine his accusers about potential sources of bias or motives
to lie."  *Batey v. Haas*, No. __ F.3d __, __, No. 13-1692, slip op. at 4 (6th Cir. July 21,
2014) (citing  *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).  When, as in this case, "it is
merely the *extent* of cross-examination that is limited, the trial judge retains a much wider
latitude of discretion . . . ."  *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (emphasis
in original).  The test in those circumstances "is whether the jury had enough information,
despite the limits placed on otherwise permitted cross-examination, to assess the defense
theory."  *Id*.  "All that is required in other words is that any limitation on cross-
examination be reasonable."  *Batey v. Haas*, slip op. at 5.

### b.  Evidence about Cheniqua Pinder

 Petitioner contends that he was prohibited from showing that the complainant's

biological mother, Cheniqua Pinder, had a propensity to lie and a motive for encouraging

the complainant to falsify her allegations.  According to Petitioner, the trial court's

rulings prevented him from introducing critical evidence that the allegation of sexual

abuse was the complainant's attempt to change her living arrangements.

### i. Custody

First, Petitioner asserts that he was restricted from presenting evidence of an

ongoing custody battle between Cheniqua and him over the complainant.[2]  The trial court,

however, permitted Petitioner to raise the fact that there was a custody fight.  The court

also permitted defense counsel to elicit Cheniqua's reaction to another court's decision on

the custody matter.  The trial court merely restricted Petitioner from eliciting testimony

about the reasons for the custody fight or the rationale for the family court's decision on

the custody issue.  The trial court said that the details of the custody fight were irrelevant

to the issues in dispute at Petitioner's criminal trial.  (Trial Tr. Vol. III, 71-72, Sept. 27,

2006; Trial Tr. Vol. VII, 62-63, Oct. 4, 2006; Trial Tr. Vol. VIII, 10, 26, 42, Oct. 5,

2006.)

The trial court's ruling was a reasonable restriction on Petitioner's constitutional

---

[2] Petitioner's wife, Lisa Key, testified that she thought the custody fight was about
a few different things:  a cousin's inappropriate conduct with the complainant; the fact
that the complainant's mother had moved seven or eight times; and charges against the
mother and a sister for assaulting a police officer.  When the prosecutor objected to this
testimony, the trial court charged the jury to disregard any testimony about custody
matters unless the testimony concerned the fact that there was a custody ruling or the
testimony described someone's reaction to the custody ruling.  (Trial Tr. Vol. IX, 18, Oct.
10, 2006.)

rights to present a defense and to confront the witnesses against him for a number of reasons. First, the complainant was already living with Cheniqua at the time of Petitioner's trial in 2006 (Trial Tr. Vol. IV, 92, Sept. 28, 2006) and there was no custody dispute going on then. (Trial Tr. Vol. V, 82, Sept. 29, 2006.)

Second, Cheniqua Pinder explained at trial that the custody issue arose when she started seeing another man and Petitioner got upset. She stated that there was never a court trial, but that they participated in mediation through the Friend of the Court. Because it was a lengthy process and she was missing work, she finally agreed to let Petitioner have the children, knowing that the children would go to a better school if they lived with him. She claimed that she never attempted to regain custody of the children. (Trial Tr. Vol. VI, 130-31, Oct. 3, 2006.)

Furthermore, defense counsel was permitted to ask the complainant about her parents' custody problems. Although the complainant did not know the nature of the problem (Trial Tr. Vol. V, 12-13, 89, Sept. 29, 2006), defense counsel elicited the fact that she wanted to please her mother and to re-establish ties with her at a time when she was still living with Petitioner. (*Id*. at 21-23, 49-50.)

To summarize, there was evidence of a custody dispute and that the complainant wanted to make her mother happy. This evidence provided the jury with enough information to assess the defense theory that the complainant may have fabricated her allegations about Petitioner to please Cheniqua and that Cheniqua had a reason to encourage the complainant to lie.

23

### ii. Cheniqua's Allegations of Rape and Stolen Property

Petitioner claims that he was thwarted from questioning Cheniqua about her prior allegation that Petitioner raped her.  Petitioner maintains that the accusation was false and that he should have been permitted to challenge Cheniqua's credibility by suggesting that she used the accusation to acquire custody of the complainant and her other children.

The issue of the alleged rape arose when defense counsel sought to question Cheniqua about her son Brandon's paternity.  Defense counsel wanted to show that Brandon was conceived when Petitioner allegedly raped Cheniqua and that Cheniqua was not a credible witness because she had "an axe to grind."  The trial court ruled in the jury's absence that defense counsel could not introduce evidence of the rape because it was too attenuated to be admissible.  (Trial Tr. Vol. VII, 41-46, Oct. 4, 2006; Trial Tr. Vol. VIII, 29-36, Oct. 5, 2006.)  This was a reasonable limitation on defense counsel's cross-examination because, as the trial court pointed out, the prosecution did not say that the alleged rape never occurred.  They simply chose not to pursue the matter because they believed they would not be able to maintain their burden of proof.  And, as further pointed out by the trial court, the contested issue at trial was whether Petitioner had sex with his underage daughter, not whether he had sex with Cheniqua.

Petitioner also claims that he was prevented from eliciting testimony to rebut Cheniqua's testimony that most of her personal belongings were missing from her apartment after she discovered Petitioner and A.K. at her apartment.  (Trial Tr. Vol. VII, 17, Oct. 4, 2006.)   Defense counsel was not permitted to ask Detective Jeff Leonard

24

whether Petitioner was charged with stealing Cheniqua's belongings. (Trial Tr. Vol. XIII, 80, Oct. 16, 2006.) But Detective Leonard had previously testified that Cheniqua's initial complaint was largely a civil matter implicating Petitioner in some missing items from her home. Detective Leonard also testified that Cheniqua subsequently advised him that she wanted to drop the theft charge. (*Id.* at 66, 69.)

The trial court agreed with the prosecutor that it was improper for defense counsel to ask Detective Leonard whether someone was charged with a crime. This was a reasonable limitation on the cross-examination of Detective Leonard, given Detective Leonard's prior testimony that Cheniqua wanted to drop the theft charge. Further, any error in the trial court's ruling could not have had a "substantial and injurious effect or influence" on the jury's verdict and, therefore, was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

### c. Evidence About A.K.

Petitioner asserts that he also was prevented from cross-examining Cheniqua about the time when she found A.K. and Petitioner inside her apartment. Defense counsel was prohibited from asking Cheniqua whether she believed she had caught Petitioner doing something wrong and whether she was actively involved with the prosecutor in A.K.'s case. But Cheniqua had already testified about being suspicious that Petitioner was doing something inappropriate with A.K. at her apartment and that she reported the incident to the police. (Trial Tr. Vol. VI, 138-43, Oct. 3, 2006; Trial Tr. Vol. VII, 14-17, Oct. 4, 2006.) The trial court therefore properly sustained the prosecutor's objections on grounds

that the matter had already been asked and answered and that the prosecutor's involvement in A.K.'s case was not a proper issue to raise.  (Trial Tr. Vol. VII, 125-26, Oct. 4, 2006.)

In another claim about A.K., Petitioner challenges the trial court's ruling that defense counsel could not question Detective Leonard as to why the investigation into A.K.'s case was closed and who made the decision to close the investigation.  The trial court sustained the prosecutor's objections to defense counsel's questions on the ground that defense counsel was raising irrelevant issues.  (Trial Tr. Vol. XIII, 75-76, Oct. 16, 2006.)

Even if the trial court's ruling violated Petitioner's right to defend himself and to cross-examine the witnesses against him, Detective Leonard testified on both direct and cross-examination that A.K. denied engaging in sexual activity with Petitioner.  Detective Leonard also testified that the allegation pertaining to Petitioner and A.K. was never prosecuted and that the police stopped investigating the matter and closed the case in 2005.  (Trial Tr. Vol. XIII, 71, 73-74, 86, Oct. 16, 2006.)  Defense counsel, moreover, brought out the fact that Detective Leonard had concluded from talking with A.K. that there was no criminal sexual conduct because there was no disclosure of wrongdoing.  *Id.* at 88.

The jury could have concluded from this testimony that there was not enough evidence to go forward with a prosecution against Petitioner for what he supposedly did to A.K.  Thus, the reason why the prosecution against A.K. was closed was evident.  Any

error in precluding defense counsel from asking who made the decision to close the

investigation could not have had a substantial and injurious effect or influence on the

jury's verdict and was harmless.

### d. Evidence about Y.K.'s Abortions

Petitioner asserts that his attorney was prevented from introducing notes from

Y.K.'s journal to show that he was not the father of Y.K.'s aborted fetuses.   The issue

arose when defense counsel asked Petitioner's wife Lisa whether Y.K.'s journal entries

explained who the father was.  The trial court ruled that the names of the putative fathers,

as noted in the journal, was irrelevant and inadmissible hearsay and that the journal

entries could not be quoted.  (Trial Tr. Vol. IX, 43-44, Oct. 10, 2006.)

The trial court's ruling was a reasonable interpretation of the State's hearsay rules.

*See People v. Burton*, 177 Mich. App. 358, 362 (1989) (explaining that, under Michigan

Rule of Evidence 801(c), "[h]earsay is an out-of-court statement offered to prove the truth

of the matter asserted").  Furthermore, Mrs. Key had already testified on direct

examination by the prosecutor that the journal named "Jason"  as the father of Y.K.'s

aborted fetuses.  (Trial Tr. Vol. VIII, 75, Oct. 5, 2006.)  Additionally, Y.K. testified that

Petitioner was not the father of her aborted babies and that she did not name him as her

babies' father in her journal.  (Trial Tr. Vol. XII, 36-37, Oct. 13, 2006.)  Given this

testimony from Y.K. and Mrs. Key, any error in restricting defense counsel's cross-

examination of Mrs. Key could not have had a substantial and injurious effect on the

jury's verdict and was harmless.

27

### e. Evidence about JaMichael Pinder

Petitioner claims that he was prevented from showing that his and Cheniqua's son JaMichael Key had behavioral problems and a motive for implicating Petitioner in the sexual abuse of the complainant. This issue arose when defense counsel asked JaMichael on cross-examination why he went to see a psychologist. The prosecutor objected on the basis that the counseling sessions were privileged information. Defense counsel argued that JaMichael's behavioral problems were relevant because they pertained to his motive, bias, and credibility. The trial court agreed with the prosecutor and ruled that JaMichael could not testify about any personal conversations he had with the psychologist. (Trial Tr. Vol. VI, 33-46, Oct. 3, 2006.) The court also stated that defense counsel could not elicit testimony regarding any behavioral deficits unrelated to the complainant. (Trial Tr. Vol. VIII, 8-9, Oct. 5, 2006.)

Despite the limitations placed on defense counsel, he was permitted to elicit information about JaMichael's relationship with Petitioner. In response, JaMichael testified that he did not have much of a relationship with Petitioner, that they did not talk, that they did not agree on issues, that he thought Petitioner did not like him, and that he did not like the things his father did. (Trial Tr. Vol. VI, at 46-49, 52.) And on cross-examination of JaMichael's mother Cheniqua Pinder, defense counsel elicited Cheniqua's testimony that she assumed JaMichael went to counseling because of his behavior. *Id*. at 7-8.

Defense counsel was permitted to elicit testimony from Petitioner's wife that JaMichael went to counseling because of custody issues and also because of his anger and behavioral issues.  (Trial Tr. Vol. IX, 24, October 10, 2006.)  Mrs. Key also admitted in response to defense counsel's questions that JaMichael had behavioral problems when she and Petitioner were caring for him.  (*Id*. at 65.)

The testimony of JaMichael, Cheniqua, and Mrs. Key provided the jury with sufficient information to assess JaMichael's credibility.  Therefore, Petitioner's right to defend himself and to confront the witnesses against him was not violated when he was prohibited from asking JaMichael why he went to see a psychologist.

### f.  Evidence about Lisa Key

Petitioner claims that he was prevented from rebutting evidence that his wife evicted him from their home as a result of the complainant's allegations.  The record belies Petitioner's claim, for defense counsel was permitted to call witnesses who implied that Mrs. Key did not kick Petitioner out of the home.  *See, e.g.,* Trial Tr. Vol. XIV, 108, Oct. 17, 2006 (Gina Young's testimony that she never heard Mrs. Key say anything about kicking Petitioner out of the house); *id*. at 121-22 (Katrina Wimblay's testimony that she and Mrs. Key did not discuss Petitioner being kicked out of the house and that Mrs. Key had said Petitioner left voluntarily).

Mrs. Key, moreover, testified on direct examination by the prosecutor, that she never kicked Petitioner out of the house.  She claimed that Petitioner came and went as he pleased, that he left on his own accord "to get his space," and that he did not move out or

29

back in.  (Trial Tr. Vol. VIII, 115 -18, Oct. 5, 2006.)  Given this testimony and the

testimony of Gina Young and Katrina Wimblay, any restrictions placed on defense

counsel's questioning of Lisa Key could not have had a substantial and injurious effect or

influence on the jury's verdict and was harmless.

The Court concludes for all the reasons given above, that Petitioner's rights to

defend himself and to confront the witnesses against him were not violated.

Alternatively, the alleged constitutional violations were harmless error.  And because

Petitioner's due process claim regarding prior "bad acts" evidence also lacks merit,

Petitioner has no right to relief on the basis of his first claim.

## B.  The Prosecutor

Petitioner claims that the prosecutor engaged in severe and repeated outcome-

determinative misconduct, which deprived him of a fair trial.  Respondent argues that

portions of Petitioner's prosecutorial-misconduct claim are procedurally defaulted.

Petitioner replies that his claim is not procedurally defaulted.  A procedural default "is not

a jurisdictional matter," *Trest v. Cain*, 522 U.S. 87, 89 (1997), and a determination of

whether all of Petitioner's prosecutorial-misconduct claims are procedurally defaulted

"adds nothing but complexity to the case."  *Babick v. Berghuis*, 620 F.3d 571, 576 (6th

Cir. 2010).  The Court therefore proceeds to the merits of Petitioner's prosecutorial-

misconduct claim.

### 1.  Legal Framework

Prosecutors "may strike hard blows," but they are "not at liberty to strike foul

30

ones.  It is as much [their] duty to refrain from improper methods calculated to produce a

wrongful conviction as it is to use every legitimate means to bring about a just one."

*Berger v. United States*, 295 U.S. 78, 88 (1935).  Nevertheless, "[c]laims of prosecutorial

misconduct are reviewed deferentially on habeas review."  *Millender v. Adams*, 376 F.3d

520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).

> [I]t "is not enough that the prosecutor['s] remarks were undesirable or even
> universally condemned."  *Darden v. Wainwright*, 699 F.2d [1031, 1036
> (11th Cir. 1983)].  The relevant question is whether the prosecutor['s]
> comments "so infected the trial with unfairness as to make the resulting
> conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S.
> 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).  Moreover, the appropriate
> standard of review for such a claim on writ of habeas corpus is "the narrow
> one of due process, and not the broad exercise of supervisory power."  *Id.*,
> at 642, 94 S.Ct., at 1871.

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  "To constitute a denial of due process,

the misconduct must be 'so pronounced and persistent that it permeates the entire

atmosphere of the trial.' "  *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (quoting

*Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

> Federal courts in this Circuit

> apply a "two-part test to determine whether the state court reasonably
> applied the federal standard in holding that prosecutorial misconduct did not
> render [the defendant's] trial fundamentally unfair."  *Irick v. Bell*, 565 F.3d
> 315, 324 (6th Cir. 2009).  [A court must] first determine whether the
> prosecution's conduct was improper.  *Id.*  Second, [a court must] determine
> whether that improper conduct was flagrant by considering four factors:
> "(1) whether the evidence against the defendant was strong; (2) whether the
> conduct of the prosecution tended to mislead the jury or prejudice the
> defendant; (3) whether the conduct or remarks were isolated or extensive;
> and (4) whether the remarks were made deliberately or accidentally."  *Id.*
> (internal quotation marks omitted).

31

*Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir.), *cert. denied sub nom Wogenstahl v. Robinson*, __ U.S. __, 133 S. Ct. 311 (2012).

### 2. Use of Witnesses

Petitioner claims that the prosecutor used witnesses in a way that exceeded the limited scope of their purpose. Specifically, Petitioner claims that the prosecutor introduced a plethora of unrelated evidence about Y.K. and A.K. and violated the procedure for admitting "other acts" evidence under Michigan Rule of Evidence 404(b). Petitioner asserts that the evidence was designed to denigrate his character, confuse the jury, and improperly try him for three cases of criminal sexual conduct instead of one case.

The alleged violation of the Michigan Rules of Evidence is not a basis for habeas relief. *Hall v. Vasbinder*, 563 F.3d at 239. Furthermore, the essence of Petitioner's claim is that the use of prior "bad acts" evidence was improper. As noted above, that claim "is not cognizable on federal habeas review, inasmuch as it involves no constitutional dimension." *Bey v. Bagley*, 500 F.3d at 523. The Court therefore rejects Petitioner's claim that the prosecutor made alleged improper use of witnesses.

### 3. Comments

Petitioner contends next that the prosecutor made improper comments during the presentation of her case. According to Petitioner, the prosecutor elicited hearsay statements and posed questions in a way that allowed her to testify. Petitioner also claims that the prosecutor asked questions which portrayed him as immoral. For example, the

prosecutor asked Petitioner's wife Lisa about Petitioner hitting her son Jordan and about having a child with Cheniqua Pinder while he was married to Lisa. (Trial Tr. Vol. IX, 10-14, 17, Oct. 10, 2006.) The prosecutor also insinuated that Petitioner and Gloria Kidd had not cooperated with the prosecution. (Trial Tr. Vol. XI, 33-34, Oct. 12, 2006.) Petitioner maintains that the cumulative effect of the prosecutor's errors deprived him of a fair trial.

For the most part, Petitioner's claims pertain to alleged violations of state law and the Michigan Rules of Evidence in particular. "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. at 780. And even if the prosecutor's questions about Petitioner hitting his wife's son and impregnating Cheniqua Pinder while he was married to Lisa Key, the evidence against Petitioner was strong. The complainant did not waver in her testimony, and her testimony was corroborated by other witnesses, including her brother and her step-grandparents (the Weirs).

The trial court, moreover, repeatedly informed the jurors that the attorneys' questions, comments, and arguments were not evidence. (Trial Tr. Vol. II, 155-56, 158, Sept. 26, 2006; Trial Tr. Vol. VI, 83, Oct. 3, 2006; Trial Tr. Vol. XIII, 110, October 16, 2006; Trial Tr. Vol. XV (Part 1), 5, 88, Oct. 26, 2006.) The trial court also instructed the jurors that the attorneys were not testifying and that only the answers to their questions were evidence. (Trial Tr. Vol. VI, 72, Oct. 3, 2006.) The Court therefore declines to grant relief on the basis of the prosecutor's miscellaneous comments and questions.

### 4. Closing Arguments

Petitioner asserts that the prosecutor made improper comments during her closing

argument.  First, Petitioner objects to the prosecutor's comments that,

> in the beginning you didn't hear me say anything about [Y.K.] other than [Y.K.] had reported and that that was the reason why [the complainant] delayed her reporting  We weren't going to go into that, but that became relevant after the opening.

(Trial Tr. Vol. XV (Part 1), 8-9, Oct. 26, 2006.)

Petitioner interprets these comments to mean that defense counsel did something wrong and that his opening statement forced the prosecutor to introduce evidence that the jury would not have otherwise heard.  But the prosecutor did not say that defense counsel did anything wrong.  She went on to explain her burden of proof, the charges, and the chronology of events.  The disputed comment was a fleeting remark in a lengthy trial.  It was not improper and, even if it were, the remark was not flagrant.

Next, Petitioner claims that the prosecutor injected herself into the case, denigrated defense counsel, led the jury to believe defense counsel was hiding evidence, and asserted a fact not in evidence.  A prosecutor may not interject personal beliefs into the presentation of her case, nor "make unfounded and inflammatory attacks on the opposing advocate."  *United States v. Young*, 470 U.S. 1, 8-9 (1985).  Prosecutors also must not assert facts never admitted in evidence.  *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000).  Consequently, the prosecutor's comment that A.K. was not telling the truth (Trial Tr. Vol. XV (Part 1), 22, Oct. 26, 2006) was improper, as were her comments that defense counsel was trying to deceive the jurors and that defense counsel was like an octopus who puts up a smokescreen and then tries to slink away in the confusion.  (*Id*. at

28-29, 65.)

It was also improper for the prosecutor to insist there was evidence that Petitioner put someone into a coma. (*Id*. at 80.) There was no such evidence. The prosecutor asked a defense witness whether he knew that Petitioner had been convicted of beating a man into a coma, but the witness claimed that he did not know about the conviction (Trial Tr. Vol. XIV, 92, Oct. 17, 2006), and the prosecutor did not present any evidence to substantiate her claim. However, when the prosecutor raised the issue during her closing argument, the trial court immediately instructed the jury to ignore the argument about the prior conviction. (Trial Tr. Vol. XV (Part 1), 80, Oct. 26, 2006.) This instruction cured the prosecutor's error.

As for the other improper comments and arguments, the trial court informed the jurors that the attorneys' arguments and comments were not evidence, but were meant to help the jury understand their legal theories. "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and a trial court generally can correct improprieties in a prosecutor's closing argument "by instructing the jury that closing arguments are not evidence." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)). The Court therefore declines to grant relief on the basis of the prosecutor's closing argument.

### 5. Conclusion

The prosecutor's questions, comments, and arguments were intentional, and, at times improper, but the evidence against Petitioner was strong. The remarks by

themselves likely did not mislead the jury or prejudice Petitioner, and Petitioner's

cumulative-error claim is not cognizable on habeas corpus review. *Sheppard v. Bagley*,

657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir.

2005)), *cert. denied sub nom Sheppard v. Robinson*, __ U.S. __, 132 S. Ct. 2751 (2012).

The Court therefore concludes that the prosecutor's conduct, even if improper, was not so

flagrant as to warrant reversal of Petitioner's conviction.

## C.  The Jury Venire

Petitioner alleges that he was denied his constitutional right to be tried by an

impartial jury drawn from a fair cross-section of the community.  Petitioner is an African

American, and he maintains that African Americans were underrepresented in his jury

venire, as there were only three African Americans in the venire.  Respondent argues that

this claim is procedurally defaulted.

### 1.  Procedural Default

A procedural default is "a critical failure to comply with state procedural law."

*Trest v. Cain*, 522 U.S. at 89.  The doctrine of procedural default prohibits a federal court

from reviewing the merits of a habeas petitioner's claims, including constitutional claims,

if a state court declined to hear the claims because the prisoner failed to abide by a state

procedural rule.  *Martinez v. Ryan*, __ U.S. __, __, 132 S. Ct. 1309, 1316 (2012).   In this

Circuit,

> "[a] habeas petitioner's claim will be deemed procedurally defaulted if each
> of the following four factors is met:  (1) the petitioner failed to comply with
> a state procedural rule; (2) the state courts enforced the rule; (3) the state

36

procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default."   [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011)].  To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim."  *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (*en banc*).

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013).

The state procedural rule in question here is Michigan Court Rule 6.508(D)(3), which generally prohibits state courts from granting relief from judgment if a defendant could have raised his claims on appeal from his judgment or sentence.  An exception exists if the defendant shows "good cause" for his or her failure to raise the claims on appeal and "actual prejudice from the alleged irregularities."  Petitioner did not comply with the spirit of this rule by raising his challenge to the jury venire on direct appeal from his convictions.  And the last state court to review Petitioner's claim in a reasoned opinion enforced the rule by citing Rule 6.508(D)(3) and stating that Petitioner failed to show good cause for not raising his argument about the jury venire on appeal.  Rule 6.508(D) is an adequate and independent state ground for denying relief on a petitioner's federal claims.  *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005) (citing *Simpson v. Jones*, 238 F.3d 399, 407-08 (6th Cir. 2000), and *Munson v. Kapture*, 384 F.3d 310, 315 (6th Cir. 2004)).  Therefore, Petitioner must show cause for his procedural default of failing to raise his claim on direct appeal and prejudice from the alleged unconstitutional irregularity.

## 2. "Cause" for the Procedural Default

Petitioner alleges that his appellate attorney on direct review was "cause" for any procedural defaults he may have committed. "Ineffective assistance of counsel can constitute cause for a procedural default," *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013), *petition for cert. filed*, Nos. 13A1070 and 14-5246 (U.S. July 14, 2014), but "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default . . . ." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). An attorney is constitutionally ineffective only if the attorney's "performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To determine whether Petitioner's appellate attorney was ineffective for failing to raise Petitioner's claim about the jury venire, the Court "look[s] to the strength of the underlying claim. " *Moore v. Mitchell*, 708 F.3d 760, 778 (6th Cir.) (citing *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008)), *cert. denied*, __ U.S. __, 134 S. Ct. 693 (2013). In assessing the claim, the Court notes that "[t]he Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522  (1975)).

> In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), th[e Supreme] Court described three showings a criminal defendant must make to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement. He or she must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the

> representation of this group in venires from which juries are selected is not
> fair and reasonable in relation to the number of such persons in the
> community; and (3) that this underrepresentation is due to systematic
> exclusion of the group in the jury-selection process." *Id*., at 364, 99 S.Ct.
> 664.

*Id*. African Americans are a distinctive group, but Petitioner has failed to show that the

number of African Americans in his venire was not fair and reasonable in relation to the

percentage of African Americans in the community from which his jury was chosen.

Petitioner also has failed to show that the alleged underrepresentation was due to

systematic exclusion of African Americans in the jury-selection process.  In fact, he

concedes that further investigation into this matter is needed to prove a systematic

exclusion of African Americans from Kent County jury venires at the time of his trial.

The Court concludes that Petitioner has failed to show a *prima facie* claim of

underrepresentation of African Americans in his jury venire.  Therefore, his appellate

attorney was not ineffective for failing to raise the issue on direct appeal, and ineffective

assistance of appellate counsel does not constitute "cause" for his procedural default.  The

Court need not consider whether Petitioner has established prejudice from the alleged

violation of constitutional rights, because he has not shown "cause."  *Tolliver v. Sheets*,

594 F.3d 900, 930 n.13 (6th Cir. 2010).

### 3.  Miscarriage of Justice

In the absence of "cause and prejudice," Petitioner can prevail on his procedurally

defaulted claim only if he "demonstrate[s] that the failure to consider [his claim] will

result in a fundamental miscarriage of justice.  A fundamental miscarriage of justice

results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440

F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. at 496).  To be credible,

however, "such a claim requires [the] petitioner to support his allegations of

constitutional error with new reliable evidence – whether it be exculpatory scientific

evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not

presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  "A petitioner's burden at

th[is] gateway stage is to demonstrate that more likely than not, in light of the new

evidence . . . any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S.

518, 538 (2006).

Petitioner has not produced any new evidence of actual innocence, and the

evidence against him was substantial.  Therefore, a miscarriage of justice will not occur

as a result of the Court's failure to address Petitioner's claim about the jury venire.   His

claim is procedurally defaulted and does not require an adjudication on the merits.

## D.  Appellate Counsel

Petitioner alleges that his appellate counsel on direct review deprived him of his

right to effective assistance of counsel because the attorney missed critical issues and

failed to properly raise some claims as federal constitutional issues.  The only state court

to address this claim was the trial court in its order denying Petitioner's motion for relief

from judgment.  The court did not adjudicate the merits of Petitioner's claim.  In fact, the

court appears to have misunderstood the claim because it stated that the claim arose from

*trial* counsel's failure to resolve the evidentiary issues in Petitioner's favor.  Because the

40

court did not adjudicate the merits of Petitioner's claim about appellate counsel, this Court reviews the claim *de novo*. *Cristini v. McKee*, 526 F.3d at 899.

The Supreme Court's decision in *Strickland v. Washington* is clearly established federal law for purposes of judging Petitioner's ineffectiveness claim. *Cullen v. Pinholster*, 131 S. Ct. at 1403. Pursuant to *Strickland*, an attorney is constitutionally ineffective only if the attorney's "performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. at 687.

An appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance." *Jalowiec v. Bradshaw*, 657 F.3d at 321. But an attorney is not required to raise every non-frivolous claim requested by the client on appeal "if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). To demonstrate that appellate counsel was ineffective, the petitioner must show (1) that his attorney unreasonably failed to discover and raise nonfrivolous issues on appeal and (2) a reasonable probability that he would have prevailed on appeal if his appellate attorney had raised the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland v. Washington*, 466 U.S. at 687-91, 694).

Appellate counsel on direct review raised some of the same issues that Petitioner has raised in his habeas corpus petition, including the evidentiary issue about prior "bad acts" evidence and the prosecutorial-misconduct issue. The habeas claims that appellate counsel could have raised on direct appeal, but failed to raise, are Petitioner's claims that

41

he was denied his right to defend himself and his right to cross-examine the witnesses against him and his claim that he was denied a jury venire drawn from a fair cross-section of the community.[3]  The Court determined above that Petitioner's prosecutorial-misconduct claim lacked merit and that Petitioner failed to establish a *prima facie* violation of his right to a fair cross-section of the community.  The Court's inquiry therefore is at an end.  "Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'"  *Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).

## IV.  CONCLUSION

For the reasons given above, the state courts' rejection of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  The state courts' rulings on Petitioner's claims also were not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 131 S. Ct. at 786-87.  Accordingly, the application for the writ of habeas corpus (Dkt. #1) is **DENIED**.

## V.  REGARDING A CERTIFICATE OF APPEALABILITY

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no

---

[3]  Appellate counsel also failed to raise Petitioner's claim of ineffective assistance of appellate counsel, but he could not be expected to raise the issue of his own ineffectiveness.  *Moore v. Mitchell*, 708 F.3d at 778.

automatic right to appeal a district court's denial or dismissal of the petition.  Instead,

[the] petitioner must first seek and obtain a [certificate of appealability.]"  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the

applicant has made a substantial showing of the denial of a constitutional right."  28

U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of

reason could disagree with the district court's resolution of his constitutional claims or

that jurists could conclude the issues presented are adequate to deserve encouragement to

proceed further."  *Miller-El v. Cockrell*, 537 U.S. at 327.

     Reasonable jurists could conclude that Petitioner's prosecutorial-misconduct claim

deserves encouragement to proceed further.  The Court therefore grants a certificate of

appealability on habeas claim two.  The Court denies a certificate of appealability as to

Petitioner's remaining claims because reasonable jurists would not find the Court's

assessment of those claims debatable or wrong, nor conclude that the claims deserve

encouragement to proceed further.


                             s/Paul D. Borman                
                             PAUL D. BORMAN
                             UNITED STATES DISTRICT JUDGE

Dated:  September 2, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 2, 2014.

s/Deborah Tofil
Case Manager